Sandra W. WARNER, Respondent,

v.

Charles H. WARNER, Appellant.

No. WD 58469.

Missouri Court of Appeals,
Western District.

Submitted Jan. 18, 2001.

Decided April 24, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 29, 2001.

Application for Transfer Denied June 26, 2001.

---

Karen A. Plax, Kansas City, for appellant.

Lori J. Levine, Jefferson City, for respondent.

Before LAURA DENVIR STITH,[1] P.J.; SMART and HOWARD, JJ.

PER CURIAM:

This is an appeal brought by Charles H. Warner ("Husband") from a dissolution of marriage decree entered by the Circuit Court of Boone County, on June 17, 1999, and from the court's subsequent order regarding the division of the couple's property. In that March 3, 2000 order, the trial court awarded Sandra Wolsfeld Warner ("Wife") one-half the value of all stock options granted during the marriage by Husband's employer, America Online, Inc. ("AOL"). Husband appeals that portion of the decree.

### Factual & Procedural Background

The parties were married on June 12, 1977, separated in February of 1997, and the marriage was dissolved December 31, 1998. Three children were born of the

---

1. Judge Stith participated in the case at the time of submission as a member of the court and was specially assigned to remain on this case by order of the Supreme Court after her appointment to the Supreme Court.

marriage: Charles, born in 1980; Sean, born in 1982; and William, born in 1990. Wife filed a petition for dissolution of the marriage on January 10, 1997, and Husband moved out of the family home on February 14, 1997. The first day of the dissolution trial was on January 14, 1998, and the hearing did not resume again for the second day of trial until April 28, 1998. Wife learned the second day of the hearings that Husband had relocated to New York City and had taken employment with America On Line, Inc. ("AOL"), beginning on March 19, 1998. The trial resumed again for the third and final day of dissolution hearings on May 28, 1998. At that point, Wife learned that, upon his employment with AOL, Husband had acquired AOL stock options. Wife moved on June 3, 1998, to reopen the case for the court to hear further evidence about the stock options. Despite Husband's lack of cooperation, Wife eventually obtained information regarding the stock options directly from AOL. A hearing was commenced on February 10, 1999, and the court issued its final judgment on June 17, 1999.

The court awarded to the parties joint legal custody of the three children, with primary physical custody of the two youngest children going to Wife and joint physical custody of the oldest child, Charles, to both parties. Husband was ordered to pay $2,055.00 per month in child support for the support of the minor children; to pay all the college costs for the Charles; and to provide health insurance coverage and to pay any health care expenses not covered by insurance for all three children.

Because Wife was a homemaker throughout most of the marriage, the trial court determined that she is unable to support herself through appropriate employment and that she lacks sufficient property to provide for her reasonable needs until she exercises the AOL stock options awarded to her by the court. The court therefore awarded Wife maintenance in the amount of $3,000.00 per month, stating: "Said maintenance shall terminate upon the death of either party, the remarriage of [Wife], or the exercise by [Wife] of any of the AOL stock options awarded to her."

Husband had been employed for many years as a professor of Journalism at the University of Missouri. At the time of the dissolution, Husband was employed by AOL as a consultant and was a part-time faculty member at the New School for Social Research in New York City. Husband began his employment with AOL on March 19, 1998, approximately two months after the first day of the hearings on the dissolution of marriage and over a year after Wife had filed for dissolution of the marriage. Husband receives a base salary of $150,000, enhanced by significant stock options, in his employment with AOL. In addition, Husband receives retirement benefits from the University of Missouri from which he retired as a full-time faculty member in April, 1998.

The trial court found that a consent order restraining each party from "transferring, encumbering, concealing or otherwise disposing of" any marital or separate property of the parties had been "repeatedly and knowingly" violated by Husband. These violations included giving $12,900.00 to a friend, Joy Ferguson; purchasing a vehicle for Ms. Ferguson; cashing in an IRA and a life insurance policy; purchasing a boat and real estate in Massachusetts; and several other expenditures in excess of $500 not accounted for by Husband. The trial court took this misconduct into consideration in its division of property, allocation of debts, and award of attorneys' fees. Apart from the AOL stock options (the property at issue in this

appeal), the parties' marital property and marital debts were divided by the court substantially equally between the parties. The total property awarded Wife was in excess of $365,000; she was assigned debts in excess of $75,000. The total property awarded Husband, minus debt, was in excess of $310,000. Husband's separate property, which included a substantial *inter vivos* trust,[2] was set aside to him. Finally, Husband was ordered to pay Wife's attorneys' fees in the amount of $39,000.00. Wife's maintenance terminated in December 1999, when she exercised her portion of the first 50,000 AOL stock options, which were divided by agreement. As to the remaining AOL stock options, the court stated:

> The America Online, Inc. Stock Options granted to [Husband] on March 16, 1998 and September 1, 1998, are marital property subject to division by the Court. The Court finds that it is not possible to determine the value of those options which have been granted but have not yet vested.

And in its decree, the trial court ordered:

> The stock options issued to [Husband] by his employer, America Online, Inc., prior to December 31, 1998, shall be distributed such that each party receives an equal share of said stock options pursuant to the terms of the attached Domestic Relations Orders. There are currently 228,000 shares granted ... all vesting between March 19, 1999, and through September 1, 2002.

Husband contests the trial court's ruling on two points. First, Husband contends that the trial court erred in treating the stock options as marital assets because: (1) he began his employment with the company subsequent to the commencement of the dissolution hearing, although prior to the judgment decree, and (2) the stock options were not "earned" during the marriage since they are contingent upon the occurrence of future events, *i.e.,* his future performance with the company.

Second, Husband contends that the trial court erred in not considering all the factors required by § 452.330 RSMo Cum. Supp.1998[3] and other non-statutory factors when it awarded Wife one-half of the stock options. Factors which should have been considered by the court, according to Husband are: that Husband is fourteen years older than Wife; he is nearing retirement age; and he suffers from serious medical problems. Husband asserts that these factors warrant that he be awarded all or most of the marital portion of the stock options.

## Standard of Review

■ The standard of review for this court-tried case is found in *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976), in which the Court interprets Rule 73.01 to mean that the judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or erroneously applies the law. The appellate court should set aside a trial court's decree or judgment on the ground that it is "against the weight of the evidence" with caution and only when there exists "a firm belief that the decree or judgment is wrong." *Id.*

## Division of the Stock Options

In his first point on appeal, Husband argues the trial court erred in determining

---

**2.** This consisted primarily of an inheritance in an amount exceeding $500,000.00.

**3.** All statutory references are to Revised Statutes of Missouri, Cum.Supp.1998, unless otherwise indicated.

that the AOL stock options granted to him subsequent to the first day of the dissolution hearing but prior to the actual judgment of dissolution are marital property. Husband contends that pursuant to § 452.330,[4] the court was required to set aside the major portion of the stock options to Husband as his separate property because he began his employment with AOL in March of 1998, subsequent to the parties' separation and subsequent to the first day of trial on January 13, 1998; because the options were not vested nor matured and would not vest nor mature until after the dissolution of the marriage; because the options were for future services to the employer; and because vesting, maturity, and exercise of the options are contingent on Husband's continuing employment with AOL.

Husband points out that the AOL stock options are subject to numerous restrictions and that unvested, unexercised options can be terminated. As of the date of the dissolution, all shares were unvested and unmatured. At the time of the post-dissolution hearing regarding the property division, 50,000 of the options were vested. A vested AOL option expires if not exercised within the time stated in the option grant. Prior to exercise, the options can be divested and forfeited if an employee is discharged for cause. If an employee terminates his employment or is terminated without cause, all vested unexercised options can be exercised for ninety days after termination of employment, but any unvested options lapse.

Husband contends that employee stock options are a form of compensation for future performance and that the option contract is a forward-looking incentive contract designed to insure the employees do their best to increase the share value. He supports this contention by pointing out that the only way an employee can realize a benefit from the option is to work for the employer until the option is vested and then exercise the option.

Wife presents a copy of Husband's employment agreement with AOL to rebut his argument that the stock options are intended as future compensation. That agreement states that he was being offered an employment contract which promised him a base salary of $150,000.00 and that *"subject to your becoming employed* you have been granted an option to purchase 25,000" shares of AOL common stock. (Emphasis added.) Husband was granted additional stock options in September 1998. Wife argues that this agree-

---

**4.** Section 452.330 states in pertinent part:

1. In a proceeding for dissolution of the marriage or legal separation, ... the court shall set apart to each spouse such spouse's nonmarital property and *shall divide the marital property and marital debts **in such proportions as the court deems just after considering all relevant factors** including:
(1) The *economic circumstances of each spouse* at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the spouse having custody of any children;
(2) The *contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker;*

(3) The *value of the nonmarital property* set apart to each spouse;
(4) The *conduct of the parties during the marriage;* and
(5) *Custodial arrangements* for minor children.
2. For purposes of sections 452.300 to 452.415 only, "marital property" means *all property acquired by either spouse subsequent to the marriage* except:....
(3) *Property acquired by a spouse after a decree of legal separation;* ....
3. All property acquired by either spouse *subsequent to the marriage and prior to a decree of legal separation or dissolution of marriage is presumed to be marital property* .... (Emphasis added.)

ment language verifies her contention that the stock options were granted as an inducement for Husband to resign his position at the University of Missouri and join AOL, not as incentives for any future performance, and were therefore earned during the marriage. Furthermore, she points out, the stated purpose of the stock option plan is "to attract such people, to induce them to work for the benefit of the Company...."

Husband's argument that the stock options cannot be treated as marital property because of the contingencies is discredited by two Missouri cases dealing with the division of pension plans in dissolution cases. In *Kuchta v. Kuchta*, 636 S.W.2d 663, 665 (Mo. banc 1982), the Missouri Supreme Court stated that "the threatened presence of contingencies which may create differing degrees of 'risk of forfeiture' does not change the fact that many potential pension benefits have been and will be created by the joint efforts of both spouses and may be treated as 'marital property'." And, in *Fairchild v. Fairchild*, 747 S.W.2d 641, 643 (Mo.App.1988), the court stated: "[t]he fact that entitlement to retirement benefits depend upon contingencies and by their nature are spec-

ulative—both as to future entitlement thereto, and as to amounts—does not deprive them of their character as marital property."

Husband equates the stock options at issue in this case to pension plans.[5] The courts sometimes distribute between the parties based upon a "time-rule"[6] system, and Husband argues that the time-rule should be applied in this case with the result that most of the options would be considered his separate property. The time-rule system takes into consideration the number of years of employment during the marriage and compares that number to the total number of years employed in arriving at a determination for the division of the property. In support of this premise, Husband cites numerous out-of-state cases in which the courts have applied the "time-rule" approach to the division of marital assets when retirement plans containing pensions and stock options were involved.[7] Two of the leading "time-rule" approach cases advanced by Husband are *In re Marriage of Short*, 125 Wash.2d 865, 890 P.2d 12 (banc 1995) and *In re Marriage of Hug*, 154 Cal.App.3d 780, 201 Cal. Rptr. 676 (Cal.Ct.App.1984).

**5.** *Eric Hollowell, Annotation, Divorce and Separation: Treatment of Stock Options for Purposes of Dividing Marital Property,* 46 A.L.R.4th 640 § 2[b] (1986) states:

[S]everal courts have compared employment-related stock options with pensions, retirement benefits, and other forms of deferred compensation, and have chosen to employ either those cases' rationales or their methods of allocation and distribution to apportion the parties' interests in one spouse's options.

**6.** The "time-rule" has been defined as "the ratio of the time the [spouse] was employed between the dates of marriage and separation and the total amount of time [the spouse] was employed." *Sonja A. Soehnel, Annotation, Necessity that Divorce Court Value Property*

*Before Distributing It,* 51 A.L.R.4th 11 § 20[c] (1987).

**7.** With regard to those various courts' opinions, it has been noted that

... most courts have recognized that at some point, whether after accrual or maturity, stock options or their value are subject to division or at least consideration on dissolution of marriage, but courts have broad discretion to allocate marital and separate property interests in the options, and *the methods that the courts have used to effect distribution of the parties' interests are almost as numerous as there are decisions regarding the treatment of options in a divorce.*
*Hollowell, Divorce and Separation,* 46 A.L.R.4th 640 at § 2[a] (emphasis added).

In *Short*, 890 P.2d at 12, the court relied upon Washington's community property rules and its "living separate and apart" statute to determine that unvested stock options granted husband during the marriage, but while the parties were living separate and apart, were strictly the separate property of husband.[8] The Washington Supreme Court in *Short* thoroughly examined the "time-rule" as applied by various other jurisdictions[9] and concluded that it was the approach Washington should take in dealing with unvested stock options in dissolution cases. *Short*, 890 P.2d at 15–16. The decision was based upon the fact that (1) Washington is a community property jurisdiction, and (2) Washington's "living separate and apart" statute determines the classification of property as either community or separate. *Id.* Missouri has no statute comparable to Washington's "living separate and apart" statute.

The court noted that most states apply a "time rule" formula, similar to the one set forth in *In re Marriage of Hug*, 154 Cal. App.3d 780, 201 Cal.Rptr. 676 (Cal.Ct.App. 1984), to determine when unvested employee stock options are acquired. *Short*, 890 P.2d at 15. But the court described the "time rule" as "a formula[10] for allocating stock options according to the employment services performed prior to and after the date the parties were 'living separate and apart'." *Id.*

Concluding that its interpretation of the "time-rule" approach differs from that an-

---

**8.** The *Short* court explained:

[I]n community property jurisdictions, assets acquired during marriage are community property. .... Separate property is defined as property acquired before marriage or acquired after marriage by gift, bequest, devise or descent. Separate property also includes the earnings and accumulations of a husband or a wife *while living separate and apart*. "When a husband and wife are living separate and apart, their respective earnings and accumulations shall be the separate property of each" (quoting R.C.W. 26.16.140).

*Short*, 890 P.2d at 14–15 (emphasis added) (internal citations omitted).

**9.** In support of its position, the *Short* court included the following cases:

*Salstrom v. Salstrom*, 404 N.W.2d 848, 851 (Minn.Ct.App.1987) (employee stock options granted to one spouse prior to the dissolution of marriage, yet scheduled to vest after the dissolution of marriage, should have been apportioned to reflect their marital and nonmarital aspects); *Warren v. Warren*, 2 Ariz.App. 206, 208, 407 P.2d 395 (1965) (after dissolution of the marriage, husband's interest in company stock purchase plan, which is dependent upon his continued employment at the company, is the husband's separate property); *Hall v. Hall*, 88 N.C.App. 297, 307, 363 S.E.2d 189 (1987) (unvested stock options

granted to an employee which are not exercisable as of the date of separation and which may be lost as a result of events occurring thereafter, are the separate property of the spouse for whom they may, depending upon the circumstances, vest at some time in the future).

Interestingly, though, the court concluded its list with a reference to the *Smith* case from Missouri (*see* discussion of *Smith, infra* ). The court stated:

But see, *Smith v. Smith*, 682 S.W.2d 834, 837 (Mo.Ct.App.1984) (a stock option is earned when the contract for the stock option is signed, and thus, even though continued employment was required by the husband after the divorce trial to exercise many of the options, all the options were characterized as marital property).

*Short*, 890 P.2d at 16.

**10.** The Washington Supreme Court stated that the "time rule" is "a fraction whose numerator is the period of time between the commencement of the spouse's employment ... and the date the parties were found to be 'living separate and apart', and the denominator is the period of time between commencement of employment and the date when each option is first exercisable, multiplied by the number of shares which can be purchased on the date the option is first exercisable." *Short*, 890 P.2d at 15–16.

nounced in *Hug,* 154 Cal.App.3d 780, 201 Cal.Rptr. 676 (1984), the court in *Short* continued its analysis:

> After determining whether employee stock options were granted to compensate the employee for past, present, or future employment services, the "time rule" is applied. For future employment services, the "time rule" is applied to the first stock option to vest after the parties are found to be "living separate and apart". This is the lone stock option that includes both a community effort and a separate effort. We do not apply the "time rule" to every stock option that vests after the parties are found to be "living separate and apart" because to do so ignores the separate property provisions of RCW 26.16. Multiple stock options granted for future services vest consecutively, not concurrently. Such a ruling insures that stock options are characterized and apportioned to reflect their marital and nonmarital aspects.

*Id.* at 17.

In the final analysis, the court in *Short* based its decision primarily upon the fact that its review of the record is limited to determining whether substantial evidence exists to support the trial court's findings of fact. *Id.* at 16. The trial court had ruled that the remaining stock options were granted to the husband for future services—to ensure his continued employment and future productivity—and the Washington Supreme Court refused to disturb those findings, since the findings were supported by substantial evidence. *Id.* at 16.

Earlier, the court in *In Re Marriage of Hug,* 154 Cal.App.3d 780, 201 Cal.Rptr. 676 (Cal.Ct.App.1984), stressing that trial courts should use discretion in arriving at an equitable outcome by considering all the facts surrounding the grant and exercise of stock options, ruled that it was not an abuse of discretion by the trial court to apply the "time-rule" in that case. Emphasizing that the disposition of marital property is within the trial court's discretion, by whatever method or formula will "achieve substantial justice between the parties," the Hug court stated that "our courts have developed no precise criterion or fixed standard, but have endeavored to adopt that yardstick which is most appropriate and equitable in a particular situation...." *Hug,* 154 Cal.App.3d at 791, 201 Cal.Rptr. 676. "By this standard," the court concluded, "the trial court did not abuse its discretion in allocating the options in issue." *Id.*

In *Hug,* as in *Short,* state law provided that post-separation earnings of a spouse are the separate property of that spouse. *Id.* at 783–84, 201 Cal.Rptr. 676. In *Hug,* portions of the employee stock options at issue were exercisable only after the parties' separation, and the court sought to fairly allocate the stock options between compensation for services prior to and after the date of separation. *Id.* The *Hug* court devised a formula or "time-rule," in which the community property portion of unexercised shares consisted of a fraction whose numerator is the months of service from the date of commencement of the service to the date of the parties' separation and whose denominator is the months of service from the date of commencement of service to the date when an option could be first exercised, multiplied by the number of shares that could be purchased on the date of exercise. *Id.* at 784, 201 Cal. Rptr. 676.

The *Hug* court noted, however, that the award of stock options may provide compensation for past, present or future services, and cautioned that the tendency to conclude that options are exclusively for future services is not always appropriate in

view of the flexibility and variety of plans available and the size and circumstances of the offering company. *Id.* at 786, 201 Cal. Rptr. 676. Therefore, the court concluded, no single characterization can be given to employee stock options; whether they are compensation for future services, for past services, or for both, depends upon the circumstances involved in the grant of the stock option. *Id.* Thus, the *Hug* court stressed in its ruling that California trial courts may exercise their discretion in similar situations and "are not limited to this formula in seeking to achieve an equitable allocation of separate and community interests in employee stock options." *Id.* at 783, 201 Cal.Rptr. 676.

Husband, in arguing for the use of the "time-rule" approach in this case, acknowledges that the leading cases in the use of that approach are cases in states whose laws differ significantly from Missouri law as to the date at which marital property is determined, and also in that the leading cases are from states with community property laws.[11]

■ With regard to the consideration of pension rights in divisions of marital property, specifically those pension rights designated as "non-matured" and subject to forfeiture, the Missouri Supreme Court has termed this "a very complex problem." *Kuchta,* 636 S.W.2d at 663. While it is widely recognized that the most desirable result in a dissolution proceeding is a full and final division of marital property with no contingencies, resulting in a final, equitable, and immediate settlement of the property issues, this is not always a realis-

tic approach when dealing with the distribution of a pension plan. *Lynch v. Lynch,* 665 S.W.2d 20, 23 (Mo.App.1983). "The trial courts, therefore, are 'authorized to apply a flexible approach to accommodate the particular facts of each case', and they have 'broad discretion to design "some plan" protecting the rights and hopefully best interests of the parties'." *Id. (quoting Kuchta,* 636 S.W.2d at 665–66). The *Kuchta* Court noted that because of the large number of "pension plans" which appear to have their own unique "vesting" and "maturing" requirements, it is "imperative" that trial courts be allowed to use a flexible approach in order to accommodate the particular facts of each case. *Kuchta,* 636 S.W.2d at 665.

In *Lynch,* the husband had worked for his company for about eighteen years, all of which were during the parties' marriage. *Lynch,* 665 S.W.2d at 22. In that case the trial court adopted what the reviewing court called a "wait-and-see" approach to dividing the husband's pension plan, a method that equally divides between the parties the risk that the pension will fail to mature. *Id.* at 23 (*citing Kuchta,* 636 S.W.2d at 666). The *Lynch* court held that that approach satisfied the trial court's responsibility to divide the marital property in a just manner. *Id* . The *Lynch* court concluded:

In this case the higher retirement benefits that may be realized by the husband by continued employment after the dissolution are made possible, in part, by his years of employment during the marriage. To preclude the wife

---

11. Husband's brief states: The majority of jurisdictions ... apply a detailed analysis of the facts surrounding the grant of the options and the conditions of exerciser of the options in determining their marital component. Although *some of the leading cases are from states with community property laws* and although *some of those from equitable division*

*jurisdictions* (similar to Missouri law) *determine marital property as of the date of separation or date the petition was filed rather than at the date of dissolution* (as in Missouri), the underlying analysis of the legal and equitable considerations regarding the employee stock options apply to Missouri law. (Emphasis added.)

from an opportunity to share in these increased benefits would be unjust and inequitable. The award to the wife of a portion of the whole benefits is, at this point, an award of rights, the value of which cannot be fixed with precision until they mature. A present division of those rights which allows the wife her share of their value, when and if they mature, does not award her after-acquired separate property of her former spouse. Rather, such a division on those conditions merely assures that the parties' qualitative parity of interest will be maintained and that their respective interests in the rights that the court divided will remain of equal stature.

*Lynch,* 665 S.W.2d at 24.

There is Missouri precedent for the characterization of contingent stock options as marital property. *Smith v. Smith,* 682 S.W.2d 834 (Mo.App.1984). In *Smith,* the court held that all the employment stock options granted to the husband during the marriage were marital property even though a substantial portion of the options could not be exercised until after the termination of the parties' marriage and would be forfeited if the husband did not continue his employment.

In that case, the husband participated in two stock-option plans involving several options with different maturity dates that would enable him to purchase a total of 9,900 shares of stock in his employer's corporation. *Smith,* 682 S.W.2d at 836.

To exercise an option, the husband was required to be an employee of the corporation on the date the option matured. *Id.* at 837. At the time of the dissolution proceeding, two of the options were exercisable while the others matured at various future dates. *Id.* The trial court held that the options were marital property and distributed one-half of each option to each party; and, as in the case at hand, the trial court in *Smith* retained jurisdiction to determine questions concerning implementation of the divorce decree's provisions concerning the options. *Id.* Here, although Wife receives nothing until the right to exercise the stock options vests, under the Domestic Relations Order issued by the trial court Wife has the right to exercise her own share of the options at that time.

The husband in *Smith* claimed that because the exercise of the options was contingent upon his continued employment, they were not vested and were therefore his separate property under *Kuchta.*[12] *Smith,* 682 S.W.2d at 837. The *Smith* court distinguished its stock option decision from the *Kuchta* pension decision by stating that "[w]hile this would be in stage one of *Kuchta if it were a pension plan, this is a stock option plan.*" *Id.* (emphasis added). As a stock option plan, the property "has already been earned, while a pension is earned over the whole period of the worker's employment." *Id.*

The court pointed out, further, the value of the stock options is fixed and is not

---

**12.** Calling them "somewhat artificially designed 'time-periods'," *Kuchta,* 636 S.W.2d at 665, classifies the periods of time during the employment of a spouse when a dissolution can occur in this way:

Stage I–If the employment were terminated, and the spouse had no right to receive anything, presently or in the future, except the amount he had contributed to the plan (plus interest), retirement benefits would be "non-vested" and "non-matured."

Stage II–If the employment were terminated, and the spouse was entitled to receive certain benefits beyond prior contributions, but only after reaching a designated retirement age, such retirement benefits would be "vested" but "non-matured."

Stage III–If the employment were terminated, and the spouse was entitled presently to certain benefits, beyond prior contributions, such retirement benefits would be "vested" and "matured."

subject to change except by market forces and that it was "created by the joint effort of the spouses" and, therefore, may be treated as marital property under the flexible approach of *Kuchta*. *Smith*, 682 S.W.2d at 837. As in the case at hand, the only contingency in *Smith* was the continued employment of husband to the date he may exercise the options. That contingency was addressed in *Smith* by the court's decree that there would be no distribution until such time as husband acquired the stock. *Id.* In affirming the decision of the trial court, the reviewing court held that while, in general, it would have been better to have severed the parties' interests in the options, there were sound economic reasons why severance was neither feasible nor advisable under the circumstances of that case. *Id.*

Husband addresses *Smith* in his brief, but distinguishes it by stating in his case, the stock option benefits were not created by the joint efforts of the spouses in that he never resided with his wife while working for AOL. Husband further contends that the *Smith* court failed to consider the continued efforts which an employee spouse must undertake *after* the dissolution in order to convert the unexercisable options to that of a matured option.[13]

Wife's response to Husband's contentions is that because it is undisputed that the stock options were acquired subsequent to the marriage and prior to the decree of dissolution and were not acquired by any of the methods which would exempt them as marital property under § 452.330.2, the trial court was correct in treating the stock options, in their entirety, as marital property. Missouri courts have uniformly and without exception held that property acquired during the marriage, including that acquired after the filing of a dissolution action but before the entry of the dissolution decree, is marital property. *See Taylor v. Taylor*, 736 S.W.2d 388, 391 (Mo. banc 1987). Wife points out that "there is absolutely no question that all of the options were granted in 1998, prior to the dissolution of December 31, 1998."

Wife further points out that this decision of the trial court was highly dependent upon § 452.330 and the decisions in other jurisdictions relied upon the family law statutes applicable to their states, most of which differ considerably from those of Missouri. She also discusses numerous decisions of other states on this issue which comport with her position that the stock options should be treated entirely as marital property.

 The trial court applied the law in a fashion consistent with *Smith*.[14] The par-

---

**13.** In a more recent Missouri case dealing with the division of stock options upon the dissolution of marriage, *Kinsey-Geujen v. Geujen*, 984 S.W.2d 577, 581–82 (Mo.App.1999), the trial court awarded to wife, as her separate marital property, stock options which her employer had granted to her. *Geujen*, 984 S.W.2d at 581. Husband argued that because the court was unable to arrive at a value for the stock options, the trial court should have awarded him an undivided one-half interest in the stock options. *Id.* The key to the court's ruling in that case was the fact that at the time of trial, wife's employer was being acquired by another firm, and wife testified that she did not know whether her right to

exercise the stock option would survive the acquisition. *Id.* In upholding the trial court's decision, the appellate court pointed out that the circuit court was free to reject husband's opinions as to valuation and to accept those of wife. *Id.* at 582 The *Geujen* court also noted that husband's arguments ignored the trial court's awarding to him, as his sole and separate property, another marital asset for which it could not determine a value, future farm subsidy payments. *Id.*

**14.** We assume the trial court considered *Smith* in its decision. It is not clear from the record that Husband argued to the trial court for the application of the time rule approach.

ties did not ask for findings of fact and conclusions of law. Pursuant to Rule 73, we presume the trial court concluded that the stock options were not purely related to future performance, but were, to a substantial extent, an inducement to Husband to resign from the university and work for AOL so that he could apply to the benefit of AOL his expertise developed over the years in his profession. The trial court also, in considering the division of the options, considered the length of the marriage, the disparity in earning power and financial resources, and husband's financial misconduct, along with the other circumstances. Unless the trial court has exceeded its authority in rendering its decision in that there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law, this court should affirm the judgment. *Murphy*, 536 S.W.2d at 32.

█ The evidence in this case was such that it cannot be said that the options were entirely related to future performance. Moreover, the evidence could be viewed as indicating that Husband's expertise in broadcast and cable marketing, developed over the years of the marriage, was being recognized by AOL as a substantial factor in the grant of the options. Thus, the trial court could have viewed Wife as contributing indirectly to the award of the options. Accordingly, the court could have reasonably found that the stock options were all marital property subject to division. Point I is denied.

### Consideration of All the Factors

Husband argues in his second point on appeal that the trial court erred in not

However, Wife does not point out on appeal that Husband is making this argument for the first time, so we assume something similar was argued below.

considering all the factors of § 452.330.1 and other relevant non-statutory factors in arriving at its decision on the division of marital assets and debts. Those factors are:

(1) The *economic circumstances of each spouse* at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the spouse having custody of any children;

(2) The *contribution of each spouse to the acquisition* of the marital property, including the contribution of a spouse as homemaker;

(3) The *value of the nonmarital property* set apart to each spouse;

(4) The *conduct of the parties* during the marriage; and

(5) *Custodial arrangements* for minor children.

Section 452.330.1 (emphasis added).

Wife was awarded the marital home, having a net value of approximately $113,000; a retirement account in Husband's name in the amount of $189,000; mutual funds worth approximately $36,000; and a vehicle having a net value of $2,000. Husband was awarded his University of Missouri retirement account in the amount of $141,000; an IRA valued at $31,000; a bank account valued at $31,000; a life insurance policy with a cash value of $17,000; mutual funds of $26,000; two vehicles valued at $13,000; property in Massachusetts having a net value of $35,000; and text book royalties having an undetermined value. The AOL stock options of unknown value were equally divided between the parties.[15]

15. There was expert testimony in the case suggesting that the stock options had a potential after tax value of several million dollars.

Wife was assigned responsibility for the first mortgage of $75,000 on the marital home, the debt on the Chrysler van (amount not specified) and any credit card debts in her name. Husband was assigned responsibility for the $21,500 second mortgages on the marital home, the indebtedness (amount not specified) against the property in Massachusetts, and any credit card debt of Husband. The result is that the assets and debts divided by the court were not substantially disproportionate in that each received a net value of around $300,000, apart from the stock options. The record does not reveal the net amounts received by the parties from the exercise of the initial round of stock options, but from the expert testimony presented in the case, it is reasonable to conclude that the exercise of the options produced a handsome yield.

In support of his second point on appeal, Husband contends that contrary to § 452.330.1(2), Wife did not contribute to the acquisition of the stock options as discussed in his first point, above. Secondly, he asserts that the custodial arrangements for the children (subpoint 5 of 452.330.1) counts in his favor, because he is responsible for the joint custody of the eldest, pays over two thousand dollars a month in child support, and is required to provide for the health insurance of the children and for the college education of the eldest. Finally, Husband points out that he is now sixty-eight years old and suffers from diabetes mellitus, gout, and chronic lymphocytic leukemia, for which he has been hospitalized several times and for which he will likely require additional treatment in the future.[16] He also points out that Wife is fourteen years younger than her husband and is in good health. Additionally,

he asserts that the court should have considered the fact that his living expenses in New York City far exceed those of his wife and the fact that he is required to provide for the support and education of the children.

Wife contends that the factors enumerated in § 452.330.1 militate in favor of this court affirming the property division of the trial court, in that (1) the economic circumstances of the spouses are that Husband is employed and has substantial separate assets and a retirement income with which to support himself, whereas Wife possesses far less in the way of separate assets, is not employed and is not capable of obtaining significant employment; (2) throughout the marriage Wife has contributed to her husband's career and to the acquisition of the marital property by supporting her husband through her agreed-upon role as a stay-at-home mother and as a homemaker; (3) the trial court took into consideration the misconduct of Husband during the separation in its division of assets; and (4) Wife is responsible for the primary physical custody of the minor children.

■ As stated in *Kinsey–Geujen v. Geujen,* 984 S.W.2d 577, 581 (Mo.App. 1999): "Equal division of marital property is not the benchmark of a proper division of property[;]" rather, fairness is. "Fairness" is arrived at by applying the factors in § 452.330.1. *Id.* That statute requires the trial court to "divide the marital property in such proportions as the court deems just after considering all relevant factors...." *In re Marriage of Hash,* 838 S.W.2d 455, 459 (Mo.App.1992). An equitable division of the property cannot be accomplished simply by applying a rigid

16. Husband was hospitalized several times in 1995, including one hospitalization for pneumococcal septicemia and none for supraphrenic abscess. A physician testified that the leukemia will require additional treatment and is likely to recur or get worse. Some of the treatments for the leukemia could aggravate his diabetes.

method such as a mathematical formula; the trial court, therefore, is vested with considerable discretion in dividing the couples' property and "an appellate court will interfere only if the division is so heavily and unduly weighted in favor of one party as to amount to an abuse of discretion." *Id.* at 459.

Although Husband contends in this case that the trial court erred in not considering pertinent non-statutory factors in the division of marital assets, such as his age and physical condition, and the cost of living in New York, the record does not confirm that contention. Presumably the trial court took these factors into consideration in arriving at its equitable distribution of property. As Wife asserts in her brief, the court presumably considered the fact that Husband's future employment will be quite limited in the event his health should deteriorate further. Although further deterioration of Husband's health could be a threat to his ability to exercise all of the options due to the loss of his employment, the evidence indicated that half of the options would have already vested by now, with others vesting later in 2001 and 2002. Thus, there is a relatively short time frame as to the vesting of the options. The court may have believed, based upon the expert testimony, that the exercise of the options was likely to be quite profitable.

We do not agree that Husband has demonstrated that Wife did not indirectly contribute in any way to the attainment of his current employment. Husband complained at trial that Wife was not particularly helpful in his university career because she did not care to do much entertaining of his associates, and she disliked having him travel. Husband also claims he received the job offer through contacts which he initially formed prior to the marriage. However, there was evidence that Wife served the needs of the family, by agreement with Husband, while Husband developed expertise in areas which made him a potentially valuable consultant for AOL.

## Conclusion

The trial court did not err in regard to the stock options in question by treating them as marital property, even though they were unvested and unmatured at the time of the dissolution. We also conclude that the trial court did not abuse its discretion in dividing the stock options on a equal basis. We are not persuaded that the court failed to consider Husband's age and health in its determination of the division of the couple's marital property. The judgment of the trial court is, therefore, affirmed.